UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION NO: 23-24 |
| VERSUS | JUDGE DARREL JAMES PAPILLION |
| MICHAEL WILLIAMS | MAGISTRATE JUDGE JANIS VAN MEERVELD |

### ORDER AND REASONS

Before the Court is a Motion to Suppress Evidence filed by Defendant Michael Williams ("Williams"). R. Doc. 35. The Government opposes the motion. R. Doc. 37. For the reasons assigned below, Williams's motion is **DENIED**.

### BACKGROUND

On January 10, 2023, at approximately 8:40 p.m., Detectives Nicholas Buckel, April Augustine, and Derrick Brown, detectives with the New Orleans Police Department's ("NOPD") Violent Crime Abatement Investigation Team ("VCAIT"), were on patrol in an unmarked police car in New Orleans's Seventh Ward. R. Doc. 35-1 at 1. During their patrol, the VCAIT detectives observed Williams and three other individuals standing on the corner of North Broad Avenue and Hope Street. *Id.* As the VCAIT detectives passed the individuals in their unmarked police vehicle, the individuals clutched at their waistbands, clutching bulges that were consistent with concealed firearms. R. Doc. 37 at 7. The VCAIT detectives rounded the block and drove past the individuals again, all of whom, according to Detective Buckel, again "clutch[ed] bulges which were consistent with full[y] concealed firearms." R. Doc. 37-2 at ¶ 1.

At this point, after seeing the subjects clutch at bulges that appeared to be concealed firearms, the VCAIT detectives requested that marked police units perform a "*Terry* stop."[1] R.

---

[1] A *Terry* stop is a brief investigatory detention. *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868 (1968).

Doc. 37-1.  As soon as the marked police vehicles arrived, the subjects, including Williams, fled on foot.  *Id.*  Officer Arden Taylor, one of the officers who arrived in a marked vehicle, began chasing Williams.  *Id.*  During the pursuit, Officer Taylor saw Williams withdraw a firearm from his waistband and throw it on the public street.  *Id.*  Shortly after, Officer Taylor caught up with Williams and placed him under arrest.  *Id.*

On February 2, 2023, a federal grand jury in New Orleans indicted Williams on one count of Felon in Possession of a Firearm in violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(8).  R. Doc. 1.  On May 30, 2023, Williams brought the instant motion challenging the seizure of the firearm under the Fourth Amendment of the United States Constitution.  R. Doc. 35.  On August 15, 2023, the Court held a hearing on Williams's Motion to Suppress.  R. Doc. 48.

## LEGAL STANDARD

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. CONST. AMEND. IV.  A Fourth Amendment violation requires that the "challenged governmental action intrude[] on the challenger's 'reasonable expectation of privacy.'"  *United States v. Ramirez*, No. 22-CR-50042, 2023 WL 5925902, at *2 (5th Cir. May 10, 2023).  "One of the many ways a criminal suspect can forfeit his reasonable expectation of privacy, and thus Fourth Amendment protection, is by abandonment—the quintessential example[] being a fleeing suspect who abandons contraband by tossing it to the ground as he runs from police."  *Id.*  "In cases of alleged abandonment, courts look to '[a]ll relevant circumstances existing at the time' to determine 'whether the person prejudiced by the search had voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question.'"  *Id.* (quoting *United States v. Colbert*, 474 F.2d 174, 176 (5th Cir. 1973)).  On motions to suppress involving warrantless arrests, the Government has the burden to prove, by

2

a preponderance of the evidence, the constitutionality of the warrantless search or arrest. *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001).

## ANALYSIS

A criminal suspect forfeits his Fourth Amendment privacy interests in items he abandons while fleeing from the police before his seizure. The first question the Court must answer is whether Williams abandoned the firearm before he was seized. "A seizure occurs when an officer 'objectively manifests an intent to restrain' the liberty of an individual through either use of physical force or a show of authority." *United States v. Wright*, 57 F.4th 524, 530 (5th Cir. 2023) (citing *Torres v. Madrid*, 141 S. Ct. 989, 998, 209 L. Ed.2d 190 (2021)). The Supreme Court has found a criminal suspect fleeing from police was not seized until he was physically tackled by the pursuing officer. *California v. Hodari D.*, 499 U.S. 621, 626, 111 S. Ct. 1547 (1991).

The Court finds Williams abandoned his firearm before he was seized. Officer Taylor's testimony, as well as video evidence, shows the officers first encountered Williams freely standing on the street corner. Upon seeing the marked police vehicles approach, Williams fled on foot as Officer Taylor began approaching him. Officer Taylor testified that during his pursuit, Williams reached for his waistband, and as his hands came out of his waistband, Officer Taylor observed the weapon hitting the ground. This testimony is corroborated by video evidence showing Officer Taylor chase Williams, during which Williams reached into his waistband for the gun, before throwing the firearm on the street. At no point during this interaction, while Williams was fleeing from Officer Taylor, and Williams threw the gun to the ground, did Officer Taylor or any of the other officers physically restrain Williams's movement, nor had Williams submitted or yielded to the authority of any of the officers. Only after Williams discarded the firearm did Officer Taylor successfully restrain Williams's movement by tackling him to the ground. Based on this evidence

and clearly articulated Supreme Court jurisprudence,[2] the Court finds Williams abandoned the firearm before he was seized.

The Court next turns to whether Williams's abandonment was voluntary. As the Government notes in its briefing,[3] it is not entirely clear under what standard the Fifth Circuit assesses voluntariness in the abandonment context. Some Fifth Circuit panels have considered whether officers "compelled" fleeing suspects to abandon contraband, while others have declined to address voluntariness, seemingly finding abandonment by a fleeing suspect is *per se* voluntary. *United States v. Colbert*, 474 F.2d 174, 177 (5th Cir. 1973); *see United States v. Jones*, 347 F. App'x 129, 134 (5th Cir. 2009). The most stringent test used by the Fifth Circuit to analyze voluntariness is whether a criminal suspect abandoned contraband due to "unlawful police action." *United States v. Beck*, 602 F.2d 726, 728 (5th Cir. 1979); *United States v. Williams*, 79 F. App'x 677, 680-81 (5th Cir. 2003). In this case, the Court need not determine the precise standard for voluntariness because the officers had reasonable cause to suspect Williams was involved in criminal activity and, thus, under even the most stringent analysis, the Court finds the Government has shown Williams's abandonment was voluntary.

The officers' interaction with Williams arose out of an attempted *Terry* stop, which requires reasonable suspicion that the suspect is engaged in criminal activity. "Reasonable suspicion 'is a low threshold, requiring' only a 'minimal level of objective justification." *United States v. Castillo*, 804 F.3d 361, 367 (5th Cir. 2015) (quoting *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581 (1989)). Reasonable suspicion must, however, "be founded on specific and

---

[2] *See Hodari D.*, 499 U.S. at 626 ("The narrow question before us is whether, with respect to a show of authority as with respect to application of physical force, a seizure occurs even though the subject does not yield. We hold that it does not."); *Brower v. Inyo County*, 489 U.S. 593, 596, 109 S. Ct. 1378 (1989) ("show of authority" by police cars with flashing lights and 20 mile police chase did not amount to seizure).

[3] R. Doc. 37 at 4 n.3.

4

articulable facts rather than on a mere suspicion or 'hunch.'" *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014) (quoting *United States v. Sanders*, 994 F.2d 200, 203 (5th Cir. 1993)).  In determining whether an officer has reasonable suspicion, "[r]elevant facts and considerations may include a description of a suspect, a suspect's location and proximity to known or reported criminal activity, the timeliness of information or [of] the stop, a suspect's behavior, and the officer's experience." *United States v. Alvarez*, 40 F.4th 339, 346 (5th Cir. 2022).

Based on the record, as well as the evidence presented at the hearing on this motion, the Court finds there was reasonable suspicion Williams was engaged in criminal activity.  The officers attempted the *Terry* stop at approximately 8:40 p.m., at a high crime intersection—circumstances which lend themselves to establishing reasonable suspicion. *United States v. Hill*, 752 F.3d 1029, 1035-36 (5th Cir. 2014) ("Indeed, a person's presence in 'a high crime area' 'at night' is relevant" in the reasonable suspicion analysis) (internal citation omitted).  At the hearing on the instant motion, Detective Augustine explained the officers were patrolling several areas, including the intersection at Hope Street and North Broad Avenue, due to an uptick in crime in these neighborhoods.  Detective Augustine noted this area—specifically the block on which Williams was standing—is a priority area for NOPD.  Detective Augustine testified NOPD has made several arrests for distribution of illegal narcotics and illegal possession of firearms on this intersection, which is known by law enforcement to have a high volume of drug trafficking. Officer Taylor also testified the NOPD categorizes this intersection as a "high priority area" because of a number of shootings and homicides.  The Court found very credible the testimony of Detective Augustine and Officer Taylor that the particular intersection, where Mr. Williams and the other individuals were standing, when they were observed to be "clutching," was an area of high crime activity.

So too did the VCAIT detectives' observations of Williams and the individuals he was with contribute to the development of reasonable suspicion. The VCAIT detectives observed Williams and other individuals standing on a street corner in front of a row of businesses that were all closed. Detective Augustine testified that as they drove in an unmarked car past the individuals, the individuals all clutched at their waistbands and backed up against the wall. Detective Augustine testified, based on her nine years of experience with the NOPD, three of which she spent as a VCAIT detective, she interpreted this as a defensive stance, and suspected the individuals were grabbing at concealed firearms in their waistbands. This behavior, consistent with possession of a firearm, further go towards reasonable suspicion that Williams was engaged in criminal activity. *United States v. Wilson*, No. 22-CR-92, 2023 WL 3601590, at *5 (E.D. La. May 23, 2023) ("[T]he Court holds that the officers had reasonable suspicion to stop [Defendant] because they observed what appeared to be a concealed weapon on his person."). Moreover, the attempted *Terry* stop occurred moments after marked units were directed to the intersection by VCAIT detectives, and the subjects matched the description and precise location provided by the VCAIT detectives.[4] For all the foregoing reasons, the Court finds a reasonable suspicion of criminal activity, namely the possession of a concealed weapon, was present when officers approached Mr. Williams for a *Terry* stop, and Williams's abandonment of his firearm was voluntary and occurred before he was

---

[4] The Court notes one of the subjects standing with Williams was originally believed by VCAIT officers to be a male, but the subject was later determined to be a female. Based upon the totality of the circumstances, including the Court's review of the video evidence, as well as the testimony of the witnesses, the Court does not find VCAIT's description of the scene inaccurate because the video evidence showed a figure standing on a street corner, in the dark, dressed in dark, baggy clothing, such that one could reasonably misidentify the subject's gender.

seized.⁵ Thus, Williams did not enjoy any Fourth Amendment protection in the firearm when he was seized after abandoning it, and the firearm was not unlawfully seized.

## CONCLUSION

For the foregoing reasons, **IT IS ORDERED** Williams' Motion to Suppress Evidence (Record Document 35) is **DENIED**.

New Orleans, Louisiana, this 16ᵗʰ day of October 2023.

*[signature]*

**DARREL JAMES PAPILLION**
**UNITED STATES DISTRICT JUDGE**

---

⁵ For the same reason, even if Williams did not voluntarily abandon the firearm, there would be no Fourth Amendment violation. As explained, the officers had a reasonable suspicion to conduct the *Terry* stop, and once Officer Taylor saw the firearm, the reasonable suspicion that made the *Terry* stop lawful became probable cause—sufficient to lawfully arrest Williams—because Officer Taylor had by then become aware, based upon his own personal observation, that Williams had been in possession of a concealed firearm. *Williams*, 79 F. App'x at 681-82 ("Once [the officer] chased the fleeing [suspect] . . . and saw him discard an object, his suspicions increased to probable cause to seize him.").